Jason M. Ingber (SBN 318323)
**LEVI & KORSINSKY, LLP**
3580 Wilshire Boulevard, Suite 1260
Los Angeles, California 90010-2513
Telephone: (213) 805-8373
Email: jingber@zlk.com

Mark H. Jensen*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mjensen@zlk.com

*Counsel for Plaintiffs*

**pro hac vice* forthcoming

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEVEN HURLEY and CLINTON BROWN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RESMED CORP.,<br><br>Defendant. | Case No.: '26CV5715 CAB JLB<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Steven Hurley and Clinton Brown ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendant ResMed Corp. ("Defendant" or "ResMed"). Plaintiffs allege the following upon information and belief, based on counsel's investigation, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. The unauthorized collection and disclosure of a person's browsing activity, website interactions, personal identifiers, and device identifiers strikes at the most basic expectation of privacy in one's online life. The misconduct is especially egregious where, as here, a company affirmatively represents to users that they may control whether their data is sold, shared, or tracked, then secretly sells, shares, and tracks that data anyway.

2. ResMed owns and operates the website located at https://www.resmed.com/en-us/ (the "Website"). The Website purports to offer treatment options for conditions such as sleep apnea and chronic obstructive pulmonary disease. The Website states "[a]t Resmed, we create life-changing health technologies that people love."

3. Through the Website, visitors can, among other things, take a sleep assessment, find a sleep clinic, book a virtual appointment, and purchase masks, devices, and accessories needed for sleep apnea therapy.

4. Like many modern websites, the Website displays a data privacy banner (the "Privacy Banner") and a cookie preferences interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties.

5. Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of transmitting users' data the moment users visit the Website, before they can interact with the Privacy Banner or select their preferences in the Cookie Settings. The Tracking Tools transmit users' data to the advertising, social media, and analytics companies that designed and operate them, Meta and TikTok (collectively, the "Tracking Entities").

6. Moreover, users, including Plaintiffs, were misled by Defendant's Privacy Banner and Cookie Settings. The Website purports to let users manage their cookie preferences through the Privacy Banner and the Cookie Settings. Specifically, users may: (1) click "Reject All" on the Privacy Banner or in the Cookie Settings to reject cookies; or (2) click "Cookie Preference" to access the "Cookie Preferences" interface to manually toggle off "Functional Cookies" and

"Targeting Cookies," and click "Confirm My Choices." Yet even after users reject all unnecessary cookies, the Website continues to deploy the Tracking Tools that transmit users' data in real time.

7. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data includes webpages and products viewed; inferred interests, preferences, and other characteristics based on users' behavior and content engagement; personal, device, and technical identifiers such as device type, operating system, and browser type; persistent identifiers that enable recognition of users across sessions and websites; personal identifiers that associate users with individual profiles. Collectively, this information is referred to herein as "Sensitive Information," and it is collected the moment a user arrives on the Website.

8. By misrepresenting both the effectiveness of its tracking mechanism and users' ability to decline consent, Defendant deprives users of any real control over their Sensitive Information and their privacy.

9. Accordingly, Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631 (illegal wiretapping); and common law, including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiffs bring this action on behalf of themselves and a putative class of similarly situated persons harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A).

11. This Court has personal jurisdiction over Defendant because Defendant is registered to do business in this District and maintains its principal place of business in this District, in San Diego, California.

12. Venue is proper in this Court because Defendant's principal place of business is located in this District, in San Diego County, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

13. Plaintiff Steven Hurley is, and at all relevant times has been, a citizen of the State of California. Plaintiff Hurley accessed and used Defendant's Website while physically located in California.

14. Plaintiff Clinton Brown is, and at all relevant times has been, a citizen of the State of California. Plaintiff Brown accessed and used Defendant's Website while physically located in California.

15. Defendant ResMed is a Minnesota corporation with its principal place of business in San Diego, California. Defendant owns and operates the Website.

## FACTUAL ALLEGATIONS

### I. Plaintiffs' Experience on the Website

16. Plaintiff Steven Hurley visited Defendant's Website in or around July 2025 and used the Website to browse information related to sleep health and treatment. Particularly, Plaintiff Hurley browsed for CPAP masks and entered related search queries, such as "CPAP masks." Plaintiff Hurley maintains an account on Defendant's Website but did not make any purchases. Plaintiff Hurley maintains a Facebook account and was logged in on the same browser while using Defendant's Website. In connection with his July 2025 visit to Defendant's Website, Plaintiff Hurley was presented with the Website's Privacy Banner. Plaintiff Hurley affirmatively rejected all but strictly necessary cookies by clicking "Reject All" in the Privacy Banner, relying on Defendant's representations that doing so would disable non-essential advertising, analytics, and tracking technologies. Plaintiff Hurley reasonably believed that his browsing activity would

not be tracked beyond what was strictly necessary for the Website's basic functionality.

17. Despite Plaintiff Hurley's rejection of the Website's use of the Tracking Tools, Defendant deployed third-party Tracking Tools that intercepted and recorded Plaintiff Hurley's Sensitive Information, simultaneously transmitting the intercepted data to Tracking Entities. The intercepted communications disclosed the substance of Plaintiff Hurley's communications with the Website, including the pages he chose to review while browsing for CPAP masks and his related search queries, together with identifiers and related metadata. Plaintiff Hurley believed that his browsing activity was private. Had Plaintiff Hurley known he could not rely on Defendant's representations and that his Sensitive Information would be intercepted and sold/shared regardless of his affirmative rejection, he would not have used the Website.

18. Plaintiff Clinton Brown visited Defendant's Website in or around September, October, and November of 2025 and used the Website to browse information related to sleep health and treatment. In particular, Plaintiff Brown browsed for masks used to treat sleep apnea, chronic obstructive pulmonary disease, and other respiratory conditions, and entered related search queries. Plaintiff Brown maintains an account on Defendant's Website but did not make any purchases. Plaintiff Brown maintains a Facebook account and was logged in on the same browser while using Defendant's Website. In connection with his visits in 2025 to Defendant's Website, Plaintiff Brown was presented with the Website's Privacy Banner. Plaintiff Brown affirmatively rejected all but strictly necessary cookies by clicking "Reject All" in the Privacy Banner, relying on Defendant's representations that doing so would disable non-essential advertising, analytics, and tracking technologies. Plaintiff Brown reasonably believed that his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality.

19. Despite Plaintiff Brown's rejection of the tracking technologies, Defendant deployed third-party Tracking Tools that intercepted and recorded Plaintiff Brown's Sensitive Information, simultaneously transmitting the intercepted data to Tracking Entities. The intercepted communications disclosed the substance of Plaintiff Brown's communications with

the Website, including the pages he chose to review while browsing and searching for medical devices such as CPAP treatment masks, together with identifiers and related metadata. Plaintiff Brown believed that his browsing activity was private. Had Plaintiff Brown known he could not rely on Defendant's representations and that his Sensitive Information would be intercepted and sold/shared regardless of his affirmative rejection, he would not have used the Website.

## II. How Websites Function

20. Websites are hosted on servers, meaning their files are stored on and accessed from those servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

21. When a user navigates to a webpage by entering a URL directly or clicking a hyperlink, that user's browser contacts a DNS (Domain Name System) server, which translates the website's web address into a unique IP (Internet Protocol) address.[1]

22. An IP address is "a unique address that identifies a device on the Internet or a local network."[2]

23. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by that IP address (the "Request URL").

24. The Request URL includes a domain name and path, which identify the specific content being accessed and its location within the website's structure. The Request URL typically contains parameters, values appended to a URL to transmit data to the recipient, prefaced by a question mark to signal their use, which direct the web server to provide additional, context-sensitive content.

---

[1] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Sept. 25, 2026).

[2] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Sept. 25, 2026).

25. By viewing a URL, an ordinary person can read these parameters and determine what choices a user made on a website, including the products or articles viewed, the phrases searched, and the substance of the user's communications with the website.

26. Website owners and web developers write and manage the URLs for their websites.

27. After the Request URL is sent and the server responds, the user's browser assembles the packets sent by the server back into the HTML code of the webpage. That code is processed by the browser as it arrives[3] and rendered into the visual display according to the HTML's instructions, the visible, and usually interactive, website that most people think of.[4]

28. To provide more complex functionality, website developers embed commands written in other programming languages, such as JavaScript, within the HTML documents.[5]

29. Such code is used, among other things, to monitor and report users' activity. This code intercepts users' communications while they are in transit to a website, while a URL is being requested, and duplicates those requests, transmitting them to a first- or third-party server.

30. In short, the Internet relies on a constant, real-time exchange of requests and responses between a user's browser and a website's stored code and data. Critically, these requests and responses provide a near-complete record of everything a user does, and does not do, on a website, when and how they do it, and with what software and hardware.

---

[3] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. In short, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Populating the page: how browsers work*, MOZILLA, https://developer.mozilla.org/en-US/docs/Web/Performance/Guides/How_browsers_work (last visited Sept. 25, 2026).

[4] *What Is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Sept. 25, 2026).

[5] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Sept. 25, 2026).

## III. Defendant Programmed the Website To Identify and Track Users

31. Defendant voluntarily integrated Tracking Tools from the Tracking Entities into its Website's programming. Defendant's use of such Tracking Tools on its Website is performed pursuant to commercial agreements between Defendant and the Tracking Entities. These commercial agreements are formed to provide a commercial benefit to both Defendant and the Tracking Entities.

32. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, search for, or even hover over.

33. First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

34. Third-party cookies are placed by domains other than the Website's domain, such as advertising or analytics domains. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

35. As detailed further below, Tracking Tools, including first- and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

36. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering users' preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on users' profiles; and (iv) social media integration.

37. The Tracking Entities use the collected Sensitive Information from users, such as Plaintiffs, to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

38. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities.

## IV. The Website Misrepresented that Users Could Control the Collection and Disclosure of Their Sensitive Information

39. Defendant displayed its Privacy Banner and Cookie Settings on the Website. The Privacy Banner and Cookie Settings represented that users could make material choices about what tools were used on the website and how their data was shared with third parties. Plaintiffs relied on these representations when on the Website. However, these representations were materially false and misleading.

40. When users visited the Website in locations such as California, the Website immediately displayed a Privacy Banner stating: "We use cookies to enhance your website experience, improve functionality and support our marketing efforts. To opt out of marketing cookies, click Do Not Sell or Share My Personal Information. To learn more about our privacy practices, visit our recently updated Privacy Policy." The Privacy Banner provided users with options to click "Reject All," "Accept Cookies," or "Cookie Preference" to manage their cookie preferences.

41. After users clicked the "Reject All" button, the Privacy Banner disappeared from view.




*Figure 1 – The Website's Privacy Banner as it appeared in California, representing that users could change the Website's tracking behavior*

42. Users in locations such as New York received a similar but distinct Privacy Banner. The Privacy Banner stated: "This website uses cookies and other tracking technologies to enhance user experience, analyze website performance, and analyze traffic on our website. We also share information about your use of our site with our social media advertising and analytics partners. Further information is available in our Privacy Policy. Consumer health data privacy."




*Figure 2 – The Website's Privacy Banner as it appeared in New York, representing that users could change the Website's tracking behavior*

43. Website users in locations such as California who selected the "Cookie Preference" option were presented with the Cookie Settings, offering the options "Reject All" or "Confirm My Choices," which represented that users could control how their Sensitive Information was collected and shared by accepting only "Strictly Necessary" cookies.




*Figure 3 – The Website's Cookie Settings in California, representing that users could change the Website's tracking behavior*

44. Website users in locations such as New York who selected the "Cookie Preference" option were presented with the Cookie Settings, which only offered the option to "Confirm My Choices," which represented that users could control how their Sensitive Information was collected and shared by accepting only "Strictly Necessary" cookies.




*Figure 4 – The Website's Cookie Settings in New York, representing that users could change the Website's tracking behavior*

45. Defendant's Cookie Settings state that:

> The California Consumer Privacy Act ("CCPA") of 2018, as amended by the California Privacy Rights Act of 2020, permits California residents to opt out of the "sale" or "sharing" of Personal Information to third parties. The CCPA defines the term "sale" broadly to include the use of third-party advertising and analytics cookies. The CCPA defines "sharing" to include the use of cookies for cross-context behavioral advertising purposes. While we may use third-party ad and analytics cookies on our site, we have enabled certain functionality with our ad partners to limit their use of your Personal Information for their own purposes; therefore, we do not "sell" your Personal Information. We may, however, "share" Personal Information through our use of third-party ad cookies to tailor our ads to you based on your activity across other websites. You can also customize your cookie preferences below. You cannot opt out of our Necessary Cookies as they are used to ensure the proper functioning of our website (such as prompting the cookie banner and remembering your settings, to log in to your account, to redirect you when you log out, etc.).

46. The Cookie Settings further represent that "Strictly Necessary" cookies are necessary for the Website to function:

> These cookies are necessary for the website to function and cannot be switched off in our systems. They are usually only set in response to actions made by you which amount to a request for services, such as setting your privacy preferences, logging in or filling in forms. You can set your browser to block or alert you about these cookies, but some parts of the site will not then work. These cookies do not store any personally identifiable information.

47. The Cookie Settings further represent that "Performance" cookies are used to count Website visits and are anonymous:

> **Performance Cookies**
>
> These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site. All information these cookies collect is aggregated and therefore anonymous. If you do not allow these cookies we will not know when you have visited our site, and will not be able to monitor its performance.

48. The Cookie Settings further represent that "Functional" cookies are used to provide enhanced functionality and personalization:

> **Functional Cookies**
>
> These cookies enable the website to provide enhanced functionality and personalisation. They may be set by us or by third party providers whose services we have added to our pages. If you do not allow these cookies then some or all of these services may not function properly.

49. The Cookie Settings further represent that "Targeting" cookies are set by advertising partners and are used to build user profiles:

> **Targeting Cookies**
>
> These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information, but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising.

50. The representations made by Defendant in the Privacy Banner and Cookie Settings led Plaintiffs, and would reasonably lead all Website users similarly situated, to believe that they had disabled all but essential cookies via their express rejection. The Privacy Banner and Cookie Settings further reasonably led Plaintiffs and all reasonable users to believe that Defendant would not allow Tracking Entities, through cookies or similar technologies, to access users' Sensitive Information. Plaintiffs acted on those representations by interacting with the Website after making privacy selections intended to reject any sharing of their personal information and use of any Tracking Tools other than necessary cookies.

51. However, Defendant did not abide by Plaintiffs' expressed preferences and does not abide by users' expressed preferences. When users choose "Reject All" and reject all unnecessary cookies, they clearly communicate that they do not consent to the placement or transmission of unnecessary cookies. Nevertheless, Defendant continued to cause the Tracking Tools, including cookies that would be classified as "Targeting Cookies," to be placed or otherwise accessed on users' browsers and devices after users clicked "Reject All" or rejected all unnecessary cookies so that the Tracking Entities could intercept, transmit, and use users' Sensitive Information in real time.

**V. Defendant's Website Uses Tracking Tools**

52. Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting users' Sensitive Information in real time as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

53. Generally, the Tracking Tools function by intercepting users' communications, including Plaintiffs' Sensitive Information, in transit when they take certain actions on the Website. These actions include when they click on a link, make a search, view a product, or load any page on the Website.

54. The Tracking Tools use cookies and other identifiers to identify users, including Plaintiffs, when they visit the Website, including users who never made an account or purchase on the Website. The cookies allow the Tracking Entities to identify users, including the Plaintiffs, when they visit the Website or any other website where the Tracking Tools are present.

55. The Tracking Tools allow Defendant and the Tracking Entities to materially benefit from Plaintiffs' Sensitive Information. Defendant uses Plaintiffs' Sensitive Information to improve their marketing and advertising, while the Tracking Entities use Plaintiffs' Sensitive Information for marketing and advertising on the Website and other third-party websites, improve their own services, including enhancing the algorithms used to build their Tracking Tools, and to build personal profiles to advertise to users, including Plaintiffs.




*Figure 5 – Sample page on the Website*

## VI. The Meta Pixel

56. Facebook offers its own tracking pixel known as the Facebook or Meta Pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

57. The Meta Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel and then add code to the website to make use of the Meta Pixel.[6]

58. Upon creating a Meta Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[7] This Pixel ID initializes the Meta Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID or by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[8]

59. This Pixel ID must match "a known Pixel ID" in Meta's system,[9] and is transmitted by the Meta Pixel.[10]

60. As Facebook notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[11]

61. Defendant places the Meta Pixel on the Website to gather, collect, and then transmit user information to Facebook.[12] Defendant and Facebook use this information to build

---

[6] *Setup and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Sept. 25, 2026).

[7] *Id.*

[8] *Get Started*, FACEBOOK (updated June 30, 2026) https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Sept. 25, 2026).

[9] *Pixel Helper*, FACEBOOK, https://web.archive.org/web/20260201194915/https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Sept. 25, 2026).

[10] *Meta Pixel*, FACEBOOK (updated Nov. 15, 2023) https://developers.facebook.com/docs/meta-pixel/ (last visited Sept. 25, 2026).

[11] *Get Started, Facebook*, (updated June 30, 2026) https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Sept. 25, 2026).

[12] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and to share a tracked user's data with Facebook. *See Meta*

valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[13] Defendant directly benefits from the use of the Meta Pixel by using these profiles for advertising.

62. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[14]

63. Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

64. When a Facebook user logs onto Facebook, tracking cookies, including the "c_user" cookie, the datr cookie, and the "fr" cookie, are automatically created and stored on the user's device.[15] These cookies allow Facebook to link the data it receives through the Meta Pixel to individual Facebook users.

65. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.

66. The Meta Pixel tracks user activity on web pages by monitoring events,[16] which, when triggered, cause the Pixel to automatically send data, users' Sensitive Information, directly to Facebook.[17] Examples of events utilized by websites include a user loading a page with a Pixel installed (the "PageView event") and a user clicking a button on a page (the

---

*Pixel*, FACEBOOK (updated Nov. 15, 2023) https://developers.facebook.com/docs/meta-pixel/ (last visited Sept. 25, 2026).

[13] *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Sept. 25, 2026).

[14] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Sept. 25, 2026).

[15] *Cookies Policy: What are cookies, and what does this policy cover?*, FACEBOOK (Dec. 12, 2023) https://www.facebook.com/policy/cookies/ (last visited Sept. 25, 2026).

[16] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Sept. 25, 2026).

[17] *Id.*

"SubscribedButtonClick" event) (collectively, the "Pixel Events").[18] The Website utilizes the Pixel Events.[19]

67. The Meta Pixel also transmits Defendant's unique Pixel ID via the "id" parameter, which contains Defendant's Pixel ID of "385072887436067" for the purpose of matching the harvested data to Defendant's Website.

68. Facebook independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Facebook benefits from intercepting and analyzing users' Sensitive Information by refining its marketing algorithms and improving the effectiveness of its ad sales to all advertisers through Meta's social media platforms to target Meta's users, profiting from the ability to more accurately target potential customers.

69. Meta admits that it shares users' Sensitive Information with third parties,[20] just as Plaintiffs' Sensitive Information was shared here.

70. Defendant's use of the Facebook Pixel on the Website is demonstrated by the screenshots below:

---

[18] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Sept. 25, 2026).

[19] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Sept. 25, 2026).

[20] *See Privacy Policy*, META (Dec. 16, 2025) https://www.facebook.com/privacy/policy?section_id=4-HowDoWeShare (last visited Sept. 25, 2026).




*Figure 6 – The Meta Pixel intercepting a user's communication on the Website*




*Figure 7 – Information captured by the Meta Pixel intercepting a user's communication on the Website*




*Figure 8 – Cookies transmitted to and from the Meta Pixel on the Website*

71. When a business applies to use the Meta Pixel, it is provided with details about its functionality and its impact on private information.[21] Plaintiffs and Website users, however, are not provided this information and would have no reason to look for it, as they are not a party to Defendant's agreement with Facebook.

72. To make use of the Meta Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

73. The Facebook Terms inform website owners using the Meta Pixel that the employment of the Meta Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[22]

---

[21] *See Get Started*, FACEBOOK (updated June 30, 2026) https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Sept. 25, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data…. By default, the Pixel will track URLs visited [and] domains visited….").

[22] *Meta Business Tools Terms*, FACEBOOK (Nov. 3, 2025) https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Sept. 25, 2026).

74. The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[23]

75. Facebook directs parties implementing the Meta Pixel, here, Defendant, to encrypt request information[24] before data can be shared.[25]

76. Facebook further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

77. Facebook educates or reminds Meta Pixel users of their responsibility to inform their users of their website's data sharing and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any third party.[26]

78. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

**VII. The TikTok Pixel**

79. TikTok offers software known as a "tracking pixel" to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

80. The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website. To use the TikTok Pixel, the website operators, including

---

[23] *Id.*

[24] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes users' information visible. *See id.*

[25] *Id.*

[26] *Best practices for privacy and data use for Meta Business Tools*, FACEBOOK, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Sept. 25, 2026).

Defendant, must include the specific pixel IDs associated with their websites, which allows TikTok to link the intercepted data back to their individual TikTok business profiles.[27]

81. Defendant's TikTok Pixel ID is included in transmissions sent to and from users' devices, as seen in *Figures 9-13*; the TikTok JavaScript code in *Figure 10* references Defendant's Pixel ID, whereas the "code" variable in *Figures 9* and *10* identifies the TikTok Pixel ID, both of which reference the Pixel ID as "D3OG263C77UFH42QPH50".

82. TikTok Pixel users make use of events to collect even more specific data on users' activities, including actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loaded onto a user's browser), the value of the purchase, and the product purchased.[28]

83. These event triggers cause data to be sent as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

84. The TikTok Pixel also collects:

a. The time website actions took place;

b. The IP address;

c. Device information, including make, model, operating system, and browser information;

d. Cookies that can be used to identify users; and

e. Metadata and button clicks.[29]

---

[27] *See generally Troubleshoot with Pixel Helper*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en (last visited Sept. 25, 2026) (*noting* that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

[28] *How to Set Up Events and Parameters with Events Builder*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Sept. 25, 2026) (describing how to designate events).

[29] *About TikTok Pixel*, TIKTOK, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Sept. 25, 2026).

85. The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are, which webpages users have visited, and how they interact with the Website.

86. TikTok's "Advanced Matching" feature allows Defendant to "match customer information such as email and phone number along with actions people take on [the Website]."[30] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[31] TikTok then provides Defendant with custom audiences based on website user events, like page views, to model lookalike audiences.[32] Lookalike audiences allow Defendant to retarget users who have already visited the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[33]

87. Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to identify users and develop their marketing profiles, improving Defendant's conversion rates and reducing overall advertising costs.[34]

88. Defendant used the TikTok Pixel to monitor and log, in real time from users' browsers, when users loaded webpages.

---

[30] *About Advanced Matching for Web*, TIKTOK, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Sept. 25, 2026).

[31] *How to set up Automatic Advanced Matching*, TIKTOK, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Sept. 25, 2026).

[32] *Get started with the TikTok Pixel: a small business guide*, TIKTOK (Sept. 6, 2024) https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Sept. 25, 2026) (benefits of using the TikTok Pixel).

[33] *See* Lizzie Davey, *How to use TikTok Pixel: TikTok conversions tracking*, LEADSBRIDGE (May 2, 2025) https://leadsbridge.com/blog/tiktok-pixel/ (last visited Sept. 25, 2026).

[34] *Id.*

89. The TikTok Pixel also captures users' identifying cookies (the _ttp cookie is used to identify TikTok users[35]).

90. Plaintiffs had a reasonable expectation that their Sensitive information, including Plaintiffs' identifying information and identifier information relating to who Plaintiffs are, would not be exposed to the Tracking Tools placed by Defendant.

91. Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and create and access vast amounts of data to run successful ad campaigns.[36]

92. TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services, including the sale of targeted advertising, and to generate its own benchmarking reports to share with other TikTok business customers.[37]

93. In fact, TikTok admits that it gathers Website visitors' Sensitive Information via the TikTok Pixel and shares that Sensitive Information with third,[38] just as Plaintiffs' Sensitive Information was gathered and shared here.

94. According to a leading data security firm, the TikTok Pixel installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information, and details about users' personal health."[39] The TikTok Pixel also collects "names, passwords

---

[35] *See G-Star Raw: List of Cookies*, G-STAR, https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Sept. 25, 2026).

[36] *See Benefits of using the TikTok Pixel*, TIKTOK (Sept. 6, 2024) https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Sept. 25, 2026).

[37] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024) http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Sept. 25, 2026).

[38] *See Privacy Policy*, TIKTOK (Feb. 5, 2026) https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Sept. 25, 2026).

[39] *See* Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM) https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Sept. 25, 2026).

and authentication codes" and "transfer[s] the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[40]

95. An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:




*Figure 9 – Using a browser's "developer tools" while visiting Defendant's webpage confirms the Website loading TikTok Pixel's code onto the user's browser, which caused the transmission of an HTTP Request to TikTok's servers*

[40] *Id.*




*Figure 10 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website, including Advanced Matching and AutoAdvancedMatching*

96. The TikTok Pixel instantly sends communications to TikTok when a user views the page and tracks page interactions. The screenshots below show the webpage code, including the various TikTok scripts Defendant causes to run on users' browsers, and the electronic impulses sent to TikTok from users' browsers to aid TikTok's building of marketing profiles on users:




*Figure 11 – The TikTok Pixel intercepting a user's communication on the Website*




*Figure 12 – Information captured by the TikTok Pixel intercepting a user's communication on the Website*




*Figure 13 – Cookies transmitted to and from the TikTok Pixel on the Website*

97. To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms"). But Plaintiffs and other Website visitors are never exposed to these terms (nor would they have any reason to look for them) as they form the agreement between Defendant and TikTok, which agreement is not even known to Plaintiffs and Website visitors.

98. The TikTok Terms inform website owners using TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[41]

99. The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[42]

100. TikTok puts TikTok Pixel users, such as Defendant, on notice that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[43] TikTok makes clear that the onus is on Defendant to provide all necessary transparency

---

[41] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024) http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Sept. 25, 2026).

[42] *Id.*

[43] *Id.*

notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

101. TikTok educates and reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[44]

102. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel and ignored TikTok's warnings to safely handle its users' data and warn their users that the Website would disclose their information in a manner that threatened their private information.

### VIII. The Tracking Tools Listed Above Intercepted and Disclosed Both the Contents of Plaintiffs' Communications with the Website, as Well as Their Personal Identifiers

103. When Plaintiffs browsed on the Website, entered specific search queries related to ResMed's health-related services and/or products, navigated through specific product and/or service pages, and engaged with interactive site features, the Tracking Tools contemporaneously intercepted the Plaintiffs' browsing, which is reflected and can be seen in the Transmitted URLs. The path and query string of these Transmitted URLs reflect the substance of a user's communication and therefore constitute content.

104. The Tracking Tools also intercepted and disclosed Defendant's personal identifiers for each Tracking Tool, and the cookies that individually identified the Plaintiffs.

105. This interception, duplication, and transmission occurred inside Plaintiffs' browsers, before the communications fully reached users' devices, or before they were transmitted from users' devices, and therefore occurred while the communications were in transit, intercepted, read, duplicated, and retransmitted by the Tracking Entities, who were third parties to Plaintiffs' communications with Defendant.

---

[44] *Id.*

## IX. Plaintiffs Did Not Consent to Third-Party Tracking

106. First, counsel's investigation revealed that the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users could select "Reject All" or "Accept Cookies" on the Privacy Banner or access "Cookie Preference" to manage their cookie selections.

107. Second, even when Plaintiffs did select "Reject All" and reject all unnecessary cookies when confronted with the Privacy Banner and Cookie Settings, Defendant placed, and allowed to be placed, the c_user cookie from Meta and the _ttp cookie from TikTok, which the Tracking Tools continued to transmit to the Tracking Entities after users rejected all unnecessary cookies.

108. When Plaintiffs selected "Reject All" in the Privacy Banner, they relied on Defendant's representation that all unnecessary cookies would be rejected and continued to browse and use the Website in reliance of that representation.

109. The figures below are exemplar images taken during counsel's investigation of the Website to show post-rejection tracking and cookies on the Website by an example browser.




*Figure 14 – Evidence showing Meta Pixel still intercepting user communications on the Website after cookies were rejected*




*Figure 15 – Information captured by the Meta Pixel intercepting a user's communication on the Website after cookies were rejected*




*Figure 16 – Evidence showing Meta Pixel still transmitting cookies on user's device after cookies were rejected*




*Figure 17 – A search results page on the Website*




*Figure 18 – Evidence showing Meta Pixel still intercepting user search communications on the Website after cookies were rejected*




*Figure 19 – Information captured by the Meta Pixel intercepting a user's search communication on the Website after cookies were rejected*




*Figure 20 – Evidence showing Meta Pixel still transmitting cookies on user's device after cookies were rejected*







*Figure 21 – Evidence showing TikTok Pixel still intercepting user communications on the Website after cookies were rejected*




*Figure 22 – Information captured by the TikTok Pixel intercepting a user's communication on the Website after cookies were rejected*




*Figure 23 – Evidence showing TikTok Pixel still transmitting cookies on user's device after cookies were rejected*



*Figure 24 – Evidence showing TikTok Pixel still intercepting user search communications on the Website after cookies were rejected*



*Figure 25 – Information captured by the TikTok Pixel intercepting a user's search communication on the Website after cookies were rejected*




*Figure 26 – Evidence showing TikTok Pixel still transmitting cookies on user's device after cookies were rejected*

110. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class members suffered actual damages, including the loss of control over their personal information and the diminution in value of that information.[45] Plaintiffs' and the Class members' Sensitive Information has concrete economic value, as shown by the robust market in which such data is bought, sold, and licensed.[46] Through its Privacy Banner, Defendant represented that users could

---

[45] *See Brown v. Google LLC*, No. 20-CV-03664-LHK, 2021 WL 6064009, at *14 (N.D. Cal. Dec. 22, 2021) (finding that "[p]laintiffs 'have suffered harm in the form of diminution of the value of their private and personally identifiable data and content'" through defendant's collection of plaintiffs' data); *see also Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) (concluding that "plaintiffs who suffered a loss of their personal information suffered economic injury" and had standing sufficient to satisfy statutory requirements of economic injury).

[46] *See* Order Denying Google's Mot. for Summ. J. at 33, *Brown v. Google LLC*, No. 4:20-cv-03664-YGR, 2023 U.S. Dist. LEXIS 139895 (N.D. Cal. Aug. 7, 2023) (finding a Google pilot program paying users for access to their browsing history sufficient to establish the existence of a market for users' personal data); *see also* Madison Mills, *Exclusive: Verb lets you sell your data to AI labs for training*, AXIOS (Aug. 6, 2026) https://www.axios.com/2026/08/06/exclusive-verb-lets-you-sell-your-data-to-ai-labs-for-training (describing operations for data exchange marketplace startups Verb, Mercor, and Vana, which enable users to sell personal data as training data); Megan Morrone, *Exclusive: New wallet app lets users store their own training data*, AXIOS (Sept. 22, 2025) https://www.axios.com/2025/09/22/ai-training-data-vana-app-mit (similar).

decline non-essential tracking, thereby preserving the security and value of their Sensitive Information. Plaintiffs relied on that representation and affirmatively declined. By facilitating the Tracking Entities' interception, collection, and transmittal of Plaintiffs' Sensitive Information to the Tracking Entities regardless of Plaintiffs' affirmative rejection of all but strictly necessary cookies, Defendant took for itself and its partners the value of that information without consent or compensation. Defendant also stripped Plaintiffs of the ability to decide whether, when, to whom, and on what terms their Sensitive Information would be shared and/or sold.

111. Plaintiffs value the privacy and exclusivity of their Sensitive Information. It is plausible, and indeed likely, that Plaintiffs would at some point have monetized their data by selling or licensing it through one of the many available channels.[47] Defendant's unauthorized dissemination has foreclosed or diminished that opportunity, because data that has already been captured and distributed to third parties without restriction commands a lower price, or no price at all, in that market. Plaintiffs therefore lost the benefit of their bargain, lost the exclusive value of their Sensitive Information, and did not receive the privacy protections Defendant promised.

112. A well-developed market exists in which consumers are compensated for access to their browsing and online activity data.[48] Because Defendant and its third-party partners have already obtained Plaintiffs' information without authorization, any prospective purchaser of that information would pay less for it, or would not pay for it at all, since the information is no longer exclusive to Plaintiffs.

**<u>TOLLING</u>**

113. The statutes of limitations applicable to Plaintiffs' and the Class members' claims are tolled by Defendant's wrongful conduct and by Plaintiffs' and the Class members' delayed discovery of their claims. Defendant's acts were technically complex and inherently self-concealing, thereby preventing Plaintiffs and the Class members from discovering the unlawful disclosure of their Sensitive Information until recently.

---

[47] *See* Mills, *supra* note 46; *see also* Morrone, *supra* note 46.
[48] *See* Mills, *supra* note 46; *see also* Morrone, *supra* note 46.

114. Defendant, via the Website's Privacy Banner, misrepresented its data sharing practices.

115. Defendant possessed superior and exclusive knowledge that the Tracking Entities' Tracking Tools embedded within its Website would disclose Plaintiffs' and Class members' Sensitive Information in contradiction to Plaintiffs' cookie settings preferences.

116. Plaintiffs and the Class members could not, through the exercise of reasonable diligence, have discovered the full scope of Defendant's conduct and misrepresentations because the technology involved is highly technical and not reasonably discernible to ordinary users.

117. Plaintiffs and the Class members first became aware of Defendant's misconduct as a result of counsel's investigation and technical analysis conducted in advance of filing this Complaint, on or about September 27, 2026.

## CLASS ALLEGATIONS

118. Plaintiffs bring these claims for relief pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of the Class and the California Subclass.

119. Plaintiffs bring this class action individually and on behalf of the following Class:

> All persons in the United States who visited the Website during the applicable limitations period and selected "Reject All" on the Website's Privacy Banner or otherwise declined cookies other than Strictly Necessary Cookies (the "Class").

120. Plaintiffs bring this class action individually and on behalf of the following California Subclass:

> All members of the Class who visited the Website during the applicable limitations period while located in the State of California (the "California Subclass").

121. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

122. Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

123. NUMEROSITY: At this time, Plaintiffs do not know the number of Class members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class members may be ascertained via the records maintained by Defendant in the ordinary course of its business.

124. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant shared the Class members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class members' Sensitive Information;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether Defendant's conduct constitutes a violation of the Wiretap Act;

d. Whether Defendant's conduct constitutes unlawful intrusion upon seclusion;

e. Whether Defendant's conduct constitutes fraud;

f. Whether Defendant has been unjustly enriched by its conduct; and

g. Whether the Class members are entitled to actual damages, punitive damages, and/or statutory penalties.

125. Common questions of fact and law exist as to all California Subclass members and predominate over any questions affecting only individual members of the California Subclass. Such common legal and factual questions, which do not vary between the California Subclass

members, and which may be determined without reference to the individual circumstances of any California Subclass member, include but are not limited to the following:

a. Whether Defendant's conduct constitutes a violation of the CIPA; and

b. Whether Defendant's conduct constitutes a violation of the California Constitution

126. TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant without consent, Plaintiffs are asserting claims that are typical of the Class members.

127. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class members or whose inclusion would otherwise be improper are excluded.

128. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. Individual litigation of numerous cases would be unduly burdensome on the courts. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### COMMON LAW INVASION OF PRIVACY
### Intrusion Upon Seclusion
### (On Behalf of Plaintiffs and the Class)

129. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

130. Plaintiffs bring this cause of action individually and on behalf of all Class members.

131. Defendant intentionally intruded upon the legally protected privacy interests of Plaintiffs and the Class members by, among other things, permitting Tracking Tools to intercept

and use users' Sensitive Information by compiling it with other user information gathered across the internet, while representing to users that they could decline such collection.

132. Plaintiffs and the Class members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their personal information, including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information.[49] Plaintiffs expected that their interactions with the Website would not be shared with third-party analytics providers.

133. Defendant's intrusion, placing the Tracking Tools and enabling the Tracking Entities' access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

134. Plaintiffs and the Class members relied on Defendant's representations and exercised the Website's controls to reject all tracking but strictly necessary cookies, reasonably expecting that Defendant would honor its affirmative representation in the Privacy Banner and Cookie Settings that users could decline unnecessary cookies.

135. Despite Plaintiffs' and the Class members' affirmative rejection of unnecessary cookies, Defendant permitted the Tracking Entities to use cookies and the Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

136. Defendant lacked any legitimate business justification for permitting the placement and transmission of third-party cookies and Tracking Tools that allowed the Tracking

[49] For example, California voted to pass the California Consumer Privacy Act of 2018 ("CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA sets out that collecting and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally*, Cal. Civ. Code §§ 1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

Entities to access, intercept, and collect users' Sensitive Information, contrary to users' express selections and rejection of consent.

137. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

138. Plaintiffs and the Class members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, and punitive damages where available.

**COUNT II**
**INVASION OF PRIVACY AND**
**VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1**
**(On Behalf of Plaintiffs and the California Subclass)**

139. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

140. Plaintiffs bring this cause of action individually and on behalf of all California Subclass members.

141. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

142. California voters added the words "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative." In support of Proposition 11, voters stated that: The right of privacy is the right to be left alone.… It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control the circulation of personal information. This is essential to social relationships and personal freedom.

143. Plaintiffs and the California Subclass members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications.

144. Plaintiffs' and the California Subclass members' protected interests arise from various statutes and common law, including, *inter alia*, the Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the ability to control circulation of personal information.

145. Plaintiffs' and the California Subclass members' privacy rights were invaded through the interception and collection of their data, including their Sensitive Information, without first obtaining authorization or consent from Plaintiffs and the California Subclass members.

146. Plaintiffs and the California Subclass members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing and/or transmitting their Sensitive Information. By causing third-party cookies and other Tracking Tools to be placed on users' browsers and devices and by transmitting users' Sensitive Information to the Tracking Entities despite users' selections to reject all tracking but strictly necessary cookies, Defendant violated their reasonable expectation of privacy.

147. Defendant's intrusion, placing the Tracking Tools and enabling the Tracking Entities' access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

148. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiffs and the California Subclass members have been harmed and are entitled to compensatory and punitive relief.

**COUNT III**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiffs and the California Subclass)**

149. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

150. Plaintiffs bring this cause of action individually and on behalf of all California Subclass members.

151. CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology.

152. CIPA provides that a person is liable to another where, "by means of any machine, instrument, or contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

153. The Website, the Tracking Tools, and Plaintiffs' devices and browsers each qualify as a "machine, instrument, or contrivance, or…other manner" used to engage in the prohibited conduct at issue here. *See* Cal. Penal Code § 631(a).

154. Within the relevant time period, the Tracking Entities, including Meta and TikTok, through the use of the Tracking Tools, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs and the California Subclass members, contemporaneous with the communications transiting through or passing over any wire, line or cable or with the communications sent from or being received at any place within California.

155. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

156. Plaintiffs and the California Subclass members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. Defendant's violations of Cal. Penal Code § 631 constitute invasions of privacy of Plaintiffs' and the California Subclass members' respective rights to privacy.

157. As a direct and proximate result of Defendant's conduct, Plaintiffs and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 631. *See* Cal. Penal Code § 637.2.

**COUNT IV**
**VIOLATIONS OF THE WIRETAP ACT 18 U.S.C. § 2510, et seq.**
**(On Behalf of Plaintiffs and the Class)**

158. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

159. Plaintiffs bring this cause of action individually and on behalf of all Class members.

160. The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

161. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

162. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

163. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

164. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

165. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

166. Plaintiffs, Defendant, and the Tracking Entities are "persons" within the meaning of the Wiretap Act.

167. The Tracking Tools, Plaintiffs' devices and browsers, and Defendant's Website server constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

168. Plaintiffs had a reasonable expectation of privacy in their electronic communications with Defendant's Website, including the pages they viewed, browsing activity, and other interactions with Website features, particularly where Defendant represented through its Privacy Banner and Cookie Settings that users could reject non-required cookies.

169. Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were collected by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent from Plaintiffs' browser, for the unlawful purpose of monetizing the Plaintiffs' intercepted information, including for

combining that information with information collected about Plaintiffs from across the Internet via the same Tracking Tools and used for advertising, analytics, and marketing optimization.

170. Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages, viewed content, or otherwise communicated information to the Website through their browsers.

171. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

172. Plaintiffs did not consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiffs affirmatively rejected the Tracking Entities' tracking through Defendant's Privacy Banner.

173. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities were only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

174. Defendant intentionally procured the Tracking Entities' interception of the contents of Plaintiffs' and the Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state. Defendant engaged in such conduct for unlawful and tortious purposes, including, for example, invasion of privacy, and associating the content of Plaintiffs' and the Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a manner that exceeds what Defendant promised Plaintiffs and the Class members on its Website.

175. Additionally, Plaintiffs' communications were fraudulently disclosed and were obtained and used based on misrepresentations to Plaintiffs through the Privacy Banner.

176. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the

purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

177. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

a. damages in an amount to be determined at trial, assessed as the greater of the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, or

b. statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000; and

c. a reasonable attorney's fee and other litigation costs reasonably incurred.

## COUNT V
## COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
## (On Behalf of Plaintiffs and the Class)

178. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

179. Plaintiffs bring this cause of action individually and on behalf of all Class members.

180. Defendant made affirmative representations to users through its Privacy Banner and Cookie Settings that users could decline non-necessary cookies.

181. Defendant represented that exercising those options would limit or prevent the deployment of Tracking Tools, including Targeting Cookies, and would limit the transmission of users' Sensitive Information to the Tracking Entities.

182. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

183. These representations were false and misleading. After users, including Plaintiffs and the Class members, clicked "Reject All," Defendant deployed the Tracking Tools to intercept

and collect Plaintiffs' and the Class members' Sensitive Information and transmit the same to the Tracking Entities.

184. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices. Defendant also received reports on the Tracking Tools functionality, which would have alerted Defendant to decreased information intake if the Website's Privacy Banner and Cookie Settings were functioning as described and stopped transmitting data when users rejected cookies.

185. Defendant had the technical ability to prevent data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential Tracking Tools based on users' preferences, and Defendant could have implemented such measures.

186. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

187. Plaintiffs and the Class members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by affirmatively rejecting all but strictly necessary cookies instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

188. Plaintiffs' and the Class members' reliance was reasonable because Defendant presented the Privacy Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

189. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Class members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiffs and the Class members

suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, and loss of the privacy protection Defendant represented it would provide.

190. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' Sensitive Information despite representing that such practices would cease upon users' declination and/or rejection of consent.

191. Plaintiffs and the Class members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, and punitive damages where available.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

192. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

193. Plaintiffs bring this cause of action individually and on behalf of all Class members.

194. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

195. It is unjust that Defendant retains those benefits under circumstances in which it collected and transmitted the information in breach of the representations made to users and without valid consent.

196. Plaintiffs and the Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at their expense. Equity and good conscience require restitution or disgorgement of benefits Defendant unjustly retained. Therefore, Plaintiffs and the Class members are entitled to the relief set forth below.

## PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendant, as follows:

a. For an order determining that this action is properly brought as a class action, certifying the Class and California Subclass, and certifying Plaintiffs as the representatives of the Class and the California Subclass and their counsel as Class Counsel;

b. For an order declaring Defendant's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiffs, the Class and the California Subclass, on all counts asserted herein;

d. An award of statutory damages or penalties to the extent available;

e. An award of punitive damages to the extent available;

f. For damages in amounts to be determined by the Court and/or jury;

g. For pre-judgment interest on all amounts awarded;

h. For an order of restitution and all other forms of monetary relief;

i. An award of all reasonable attorneys' fees and costs; and

j. Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: October 6, 2026

Respectfully submitted,

*<u>/s/ Jason M. Ingber</u>*

Jason M. Ingber (SBN 318323)
**LEVI & KORSINSKY, LLP**
3580 Wilshire Boulevard, Suite 1260
Los Angeles, California 90010-2513
Telephone: (213) 805-8373
Email: jingber@zlk.com

Mark H. Jensen*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mjensen@zlk.com

*Counsel for Plaintiffs*

**pro hac vice* forthcoming